**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Docket No. 24-CR-10352-JEK**

**UNITED STATES OF AMERICA**

**v.**

**REBECCA FADANELLI**

**SENTENCING MEMORANDUM**

Now comes the Defendant, Rebecca Fadanelli, and recommends that the Court sentence her to 10 months of incarceration and joins the government in recommending 24 months of supervised release plus restitution and forfeiture.

## 1. Ms. Fadanelli Should Not Be Defined by this Case.

Ms. Fadanelli has lived a difficult life. She was raised by a single mom and has fended for herself since age 17. After witnessing a troubled marriage between her parents when she was young, she has had two violent and disruptive relationships herself. Both of those relationships produced children and currently she is being denied contact with both of her children.

According to the Presentence Report [PSR], Ms. Fadanelli was born in Brazil in March 1986. (PSR, p. 3) She resided there until age 17. (PSR, § 60) While in Brazil, she lived mostly with her mother. Her mother and

father separated and divorced when Ms. Fadanelli was just two years old. (PSR, § 61) The relationship between her parents was combative. (Id.) She did not see her father often. Eventually, he moved away and Ms. Fadanelli lost touch with him until she was thirty years old. (Id.)

While growing up with her mother, Ms. Fadanelli’s home was stable but Ms. Fadanelli was lonely and wanted other siblings. Ms. Fadanelli’s basic financial needs were met by her mother, who worked three jobs. Besides always working, Ms. Fadanelli’s mother was addicted to shopping and cosmetic surgery. (Id.)

Ms. Fadanelli’s mother has lived between Brazil and the United States during Ms. Fadanelli’s adult life. Ms. Fadanelli is very close with her mother. Ms. Fadanelli’s mother is a permanent resident of the United States and currently resides in the home Ms. Fadanelli owns, subject to a mortgage, in Stoughton. (PSR, § 64)

Ms. Fadanelli’s father is seventy-one years old and resides in Florianopolis, Brazil. He is retired from Brazil’s national electricity company, Copel. He has dealt with various forms of cancer for the past 20 years. Ms. Fadanelli talks to him weekly. (PSR, § 63)

Ms. Fadanelli traveled to the United States with her mother in 2004 in an attempt to find relatives rumored to

reside in Salem, Massachusetts. They were not successful in locating the relatives. Between 2004 and 2019, Ms. Fadanelli first resided in several Cape Cod towns before moving to Weymouth then Quincy. Since 2019 Ms. Fadanelli has resided in Stoughton. (PSR, § 62)

While living on Cape Cod, Ms. Fadanelli attended Barnstable High School, but dropped out because she had difficulty understanding English. Eventually, in about 2009, Ms. Fadanelli earned her GED. From 2008 until 2016 Ms. Fadanelli worked in restaurants and bars. In 2014 and 2015 Ms. Fadanelli began taking classes to learn various work skills. She attended the Ali May Academy, an aesthetician school in Quincy, and took nursing classes at Massasoit Community College in Brockton. In 2015 Ms. Fadanelli took classes through the Boston branch of the National Laser Institute (based in Texas) and learned how to administer injectable drugs through the University of Southern Santa Catarina in Florianopolis, Brazil. More recently, in 2024 and 2025 Ms. Fadanelli took classes in insurance sales, real estate sales, life coaching and interpreting. (PSR, §§ 89-90)

Ms. Fadanelli met Marshall Daley in 2008. Soon after they met, Ms. Fadanelli became pregnant with their daughter. Ms. Fadanelli and Mr. Daley were married in March 2009, but

their relationship began to deteriorate almost immediately. There were numerous fights and mutual restraining orders issued. They filed for divorce in 2014. (PSR, §§ 66-67)

Also in 2014 Mr. Daley falsely accused Ms. Fadanelli of sexually assaulting their daughter. Since that time Ms. Fadanelli has been constantly fighting false charges made by Mr. Daley. She also has had to litigate visitation and custody issues. Finally, in 2017, a judge determined that Mr. Daley's allegations against Ms. Fadanelli were unsupported. (Id.)

Besides lodging false allegations of sexually abusing their daughter (until 2020, when Ms. Fadanelli became a naturalized U.S. citizen) Mr. Daley used Ms. Fadanelli's immigrant status to threaten deportation and permanent separation from her daughter. After the divorce and custody issue received a ruling in the Norfolk Probate and Family Court, Mr. Daley appealed, made more false accusations and instituted further expensive litigation. (PSR, § 67)

Mr. Daley is 48 years old, lives in East Bridgewater and works for his family's business. (PSR, § 68) Because Ms. Fadanelli is detained, Mr. Daley has custody of their sixteen year old daughter and Ms. Fadanelli has not been able to oppose the custody issue. (PSR, § 69)

Unfortunately, Ms. Fadanelli had a second failed significant relationship. Beginning in 2017, Ms. Fadanelli and Dylan Zancheta dated for two years before moving in together in 2019. (PSR, § 73) Then, money issues and Mr. Zancheta's drug use, consumption of alcohol and violent behavior got in the way; but not before Ms. Fadanelli became pregnant with their son. When Ms. Fadanelli and Mr. Zancheta separated in 2021 Ms. Fadanelli retained physical custody of their son. When Ms. Fadanelli was ordered detained in November 2025, Mr. Zancheta obtained custody of the boy. (Id.) There is a custody hearing relating to Ms. Fadanelli's and Mr. Zancheta's son scheduled for September 19, 2026.

Since 2023, Ms. Fadanelli has been married to Jonatas Nascimento. Mr. Nascimento is a citizen of Brazil and unable to enter the United States. Ms. Fadanelli is able to communicate with him. He, along with Ms. Fadanelli's mother, are Ms. Fadanelli's main sources of emotional support. (PSR, § 76) Neither Mr. Daley nor Mr. Zancheta will permit contact between Ms. Fadanelli and her children.

Ms. Fadanelli has a 5 year old son. Until being ordered detained in November 2025, Ms. Fadanelli had a close and loving relationship with her son. (PSR, § 73) She was raising him and he was living with her, while having visits

with his father, Mr. Zancheta. (Id.) Since Ms. Fadanelli was ordered detained, custody of the boy has transferred to Mr. Zancheta. He has not permitted any contact between Ms. Fadanelli and her son; not even by phone. Mr. Zancheta has stated that he will never permit Ms. Fadanelli to see or talk to her son again. (PSR, § 74) As stated above, custody and visitation is subject to court orders and there is a custody hearing scheduled for September 19, 2026.

Ms. Fadanelli's relationship with her 16 year old daughter is even more complicated. From a time when the girl was young, Ms. Fadanelli's ex-husband, Mr. Daley, has used fraud and his family's modest wealth to disrupt Ms. Fadanelli's relationship with her daughter. Mr. Daley made false accusations that Ms. Fadanelli sexually abused her daughter. Once it was determined by the Probate Court that those accusations were unsupported and shared physical custody was awarded to both Ms. Fadanelli and her ex-husband, Mr. Daley appealed the ruling and made numerous motions for modification of custody. As with Ms. Fadanelli's son and his father, Ms. Fadanelli's ex-husband has prohibited contact between Ms. Fadanelli and her daughter since Ms. Fadanelli was detained in the instant case. (PSR, §§ 69-72)

Shortly before reporting for detention on November 3, 2025, Ms. Fadanelli was raped. (PSR, p. 36/Objection #2 and Probation Officer's Response and § 83) Additionally, though she was not yet aware, she was pregnant. (PSR, § 83) She took a pregnancy test at Wyatt and was transferred to the Western Massachusetts Regional Women's Correctional Center [WCC]. At WCC, Ms. Fadanelli's pregnancy was confirmed with an ultrasound but she received limited prenatal care. Ms. Fadanelli suffered a miscarriage on November 24, 2025. (Id.)

Additionally, while detained, Ms. Fadanelli (who suffers from epilepsy) has incurred several seizures at Wyatt and on July 25, 2026 needed to be hospitalized after a seizure. (PSR, § 82)

**2. The offense Conduct.**

Ms. Fadanelli has stipulated in her plea agreement that she is responsible for Counts 1 through 8. She has agreed to restitution and forfeiture of slightly more than $1 Million. The government contends that there are over 900 individuals who were victims of Ms. Fadanelli's unlawful cosmetic treatments. Most of those individuals were treated by Ms. Fadanelli or nurses Ms. Fadanelli authorized to perform the procedures. A number of clients, including two individuals (one named Charles D and the other named Amy W)

who submitted victim impact statements, are individuals with whom Ms. Fadanelli is unfamiliar. They were treated by either Caroline Duarte or Iram da Escocia, persons who Ms. Fadanelli hired to work at her spas. Ms. Duarte and Mr. Escocia had their own clients. Their clients all received procedures at Ms. Fadanelli's spas, so Ms. Fadanelli is responsible.

Ms. Fadanelli was absent from her spas and out of Massachusetts, often in Brazil, for 95 days in 2021, 105 days in 2022, 90 days in 2023 and 42 days before her arrest in 2024. When Ms. Fadanelli was away, the spas were managed by Ms. Duarte and Mr. Escocia.[1] Because Ms. Fadanelli benefitted financially and the procedures were performed at her spas when she was not there, she is responsible.

Ms. Fadanelli further admits that she was not licensed to conduct the injections she performed at her spas. Nevertheless, in Brazil Ms. Fadanelli was a biomedical technician. In both Brazil and the United States she was trained in aesthetics as well as injection procedures. It is of no consequence, but her training would be sufficient to inject cosmetic substances in Brazil.

---

[1] Ms. Duarte and Mr. Escocia were aware that the injectable cosmetic drugs were counterfeit. In fact, Mr. Escocia advised Ms. Fadanelli to switch from a South Korean supplier to Alibaba.

This case has demonstrated to Ms. Fadanelli that she cannot inject cosmetic substances (licensed or counterfeit). Going forward, Ms. Fadanelli will not be involved in cosmetic procedures again. Previously was issued numerous Board of Cosmetology licenses. Because of this case those licenses have been revoked and she will not be licensed again.

**3. The Sentencing Guidelines/3553(a) factors**

**Introduction.**

The sentencing court must accurately compute the sentencing guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. Gall v. United States, 552 U.S. 38, 49-51 (2007). Pursuant to United States v. Booker, 543 U.S. 220, 259 (2005), the sentencing guidelines are not mandatory.

After computing the sentencing guidelines, the Court must then turn to the 18 U.S.C. §3553(a) factors, and its obligation to impose a sentence sufficient but no greater than necessary to comply with the statutory sentencing goals. The Court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." Gall, at 53 (quoting Koon v. United States, 518 U.S. 81 (1996)).

Indeed, a defendant's conduct must be measured against her overall life. Put another way, "the punishment should fit the offender and not merely the crime." Pepper v. United States, 131 S.Ct. 1229, 1240 (2011). Federal statutes are in accord. The Court may consider, without limitation, any "information concerning the background, character, and conduct of" the defendant. 18 U.S.C. §3661; USSG §1B1.4. It is the Court's duty to impose a sentence which is "sufficient, but not greater than necessary," to comply with the "the basic aims of sentencing" as set out in United States v. Rita, 551 U.S. 338, 348 (2007).

**The Guidelines Calculations.**

Turning to the Guidelines, Ms. Fadanelli agrees with the PSR's calculations regarding the base offense level [BOL], adjustments, acceptance of responsibility, and her Criminal History Category [CHC], as follows:

1. Under USSG, §§ 2N2.1 and 2B1.1 (utilizing the cross-reference at USSG, § 2N2.1(c)(1)), the BOL is 6. (PSR § 33)

2. Pursuant to USSG, §2B1.1(b)(1)(H), there is a 14-level increase because there was a loss of between $550,000 and $1,500,000. (PSR § 34)

3. Pursuant to USSG, §2B1.1(b)(2)(A)(i), there is a 2-level increase because the offense involved 10 or more victims. (PSR § 35)

4. Pursuant to USSG, §2B1.1(b)(16)(A), there is a 2-level increase because the offense involved the conscious or reckless risk of death or serious bodily injury. (PSR § 36)

5. Pursuant to USSG, §3B1.3, there is a 2-level increase because the defendant abused a position of trust. (PSR § 38)

6. There is a 3-level decrease for acceptance of responsibility pursuant to USSG §§ 3E1.1(a) and (b). (PSR §§ 42 and 43)

Accordingly, Ms. Fadanelli's Total Offense Level [TOL] is 23. (PSR § 44) Ms. Fadanelli has one criminal history point and thus is in CHC I. (PSR § 49) Her Federal Sentencing Guidelines are 46-57 months.

**Zero-Point Offender Commentary.**

Before turning to an appropriate sentence, the defendant notes the Sentencing Commission's introduction of the Zero Point offender departure in USSG §4C1.1 reflected a policy goal of keeping nonviolent first-offenders out of custody. See 28 U.S.C. §994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense …"). Echoing the statutory provision in § 994(j), the imprisonment provisions of the Guidelines, §5C1.1, includes commentary that:

> "A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

USSG §5C1.1, commentary, note 10(B). The term "otherwise serious offense" is not defined in the Guidelines or elsewhere. Of course, any federal felony is serious, so the Guidelines contemplate relative seriousness. The defendant does not qualify for the Zero Point offender departure, only because of a 2012 drunk driving conviction. (PSR, prg. 47)

**The 3553(a) Factors and a Reasonable Sentence.**

Turning to the 3553(a) factors; the Court is familiar with them and they need not be ticked off mechanically. The defendant suggests that there are factors which support a downward variance from the 46 to 57 months Guidelines sentence.

After being raised by her single mom in Brazil, Ms. Fadanelli came to the United States and acquired a GED plus she took courses not only in aesthetics but nursing, insurance and real estate. She was issued numerous licenses by the Massachusetts Board of Cosmetology. Because of all the expenses she was incurring to litigate her child custody

issues she cut corners. She performed procedures for which she had some training, but wasn't licensed. Because she couldn't legally purchase licensed products, she purchased counterfeit products. Those acts were illegal and they subjected her clients to risks greater than usual.[2]

Even though Ms. Fadanelli intended to help her clients, as opposed to hurt them, some clients -- more than had she been properly licensed and purchased genuine products -- suffered unintended side effects. Not all clients suffered the unintended side effects. Those who did, did not deserve the harm Ms. Fadanelli caused. She will attempt to compensate all her clients for their losses. Of the clients who suffered unintended side effects, a few have filed civil suits against Ms. Fadanelli.

Ms. Fadanelli contends that the ten months she has been detained is a sufficient sentence to punish her for her crimes and have impressed upon her that just because she has some training in injecting cosmetic drugs, she should not

[2] According to the Journal of the American Medical Association [JAMA], licensed cosmetic procedures using genuine products cause temporary swelling, pain, bruising, or mild headaches in .18% of procedures. (Murad Alam, MD, MSCI; Rohit Kakar, MD; Michael Nodzenski, BA, *et al*, Multicenter Prospective Cohort Study of the Incidence of Adverse Events Associated With Cosmetic Dermatologic Procedures, Lasers, Energy Devices and Injectable Neurotoxins and Fillers, JAMA Dermatology, Vol. 151 No. 3, March 2015). (Ex. 1, p. 2)

have nor will she in the future.

It is Ms. Fadanelli's hope to reestablish contact with her children soon. She has had no contact with either of her two children since being detained in November 2025. She has to litigate custody issues regarding her daughter against her well funded ex-husband and regarding her son against his violent father.

In further support of her contention that ten months is a sufficient custodial sentence she cites the assistance she provided the government upon her arrest. On August 22, 2025, Ms. Fadanelli explained to the United States Attorney how she got started in aesthetics and injecting cosmetic drugs. She identified the persons from whom and sources from which she eventually started buying injectable substances. On September 17, 2025 Ms. Fadanelli provided the U.S. Attorney with details regarding others who were providing unlicensed services and purchasing counterfeit substances.[3]

---

[3] She identified a woman who was providing unlicensed cosmetic and dental services in Burlington, MA. She identified a doctor who assisted the woman obtain the necessary equipment. She identified a person who was selling counterfeit Botox. She identified a Newton plastic surgeon who allows his name to be used as a supervising physician in various Brazilian spas. Ms. Fadanelli identified other individuals providing counterfeit cosmetic drugs and offering unlicensed services in Stoughton, Framingham, Stoneham, Bridgewater, Rockland and Hyannis.

When it was determined that Ms. Fadanelli violated the terms of her supervised release by providing a client with an unlicensed service the U.S. Attorney decided that Ms. Fadanelli was not sufficiently reliable to assist in an investigation of the persons she identified. The government will not file a substantial assistance motion for Ms. Fadanelli. Nevertheless, at least some of the individuals Ms. Fadanelli identified can be investigated without using Ms. Fadanelli.

Finally, Ms. Fadanelli contends that she has sought to better herself through the programs and course offerings at the Wyatt Detention Facility. She has participated in over 10 improvement programs (Ex. 2) and earned 168 course certificates. (Ex. 3)

She has a reentry plan. She has been offered employment by Cleber Feijo (a friend for 20 years) who owns the Feijo Steak House in Stoughton. Ms. Fadanelli intends to apply for a real estate license. She knows that because of this conviction, approval for a real estate license is discretionary. Additionally, Ms. Fadanelli will seek employment as a Portugese interpreter. It is Ms. Fananelli’s intent to, as best as possible, satisfy the restitution order.

**Conclusion.**

It is Ms. Fadanelli's contention that a sentence of 10 months in custody and 24 months of supervised release, along with the restitution and forfeiture orders, are "sufficient, but not greater than necessary," to comply with "the basic aims of sentencing" as set out in United States v. Rita, 551 U.S. 338, 348 (2007). Additionally, there will be associated consequences, relating to her financial ability to keep her home in Stoughton. Her ability to litigate the child custody issues she faces will be severely compromised until she is released from custody.

**Respectfully submitted**
**REBECCA FADANELLI,**
**By her Attorney:**

**Date:** August 31, 2026 /s/ Thomas Kerner

**Thomas Kerner**
**Attorney at Law**
**MA BBO No. 552373**
**240 Commercial St., Suite 5A**
**Boston, MA 02109**
**(617) 720 5509**
**thomas.kerner@comcast.net**

**Certificate of Service**

I, Thomas Kerner, herein certify that a copy of the within document was e-filed for all parties involved.

**Date:** August 31, 2026 /s/ Thomas Kerner

**THOMAS KERNER**